IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

DWAYNE ALEXANDER                                                                        PLAINTIFF

vs.                                               NO:2:03cv00034 JFF

ARKANSAS DEPARTMENT
OF CORRECTION, et al.                                                                  DEFENDANTS

**MEMORANDUM AND ORDER**

Pending before the court is Defendants' Motion for Summary Judgment (DE# 39). Plaintiff has filed a Response (DE# 52) and Defendants have filed a Reply. Additionally, Defendant has filed a Motion to Strike Plaintiff's Exhibits to Plaintiff's Response (DE# 56), to which Plaintiff has responded (DE# 59). Defendant has also filed objections to Plaintiff's pretrial disclosure sheet (DE# 63). For the reasons set forth herein, Defendants' Motion for Summary Judgment is GRANTED.

**I. Background**

Plaintiff is an African-American who was terminated from his job as a correctional officer at the Arkansas Department of Correction (ADC), East Arkansas Regional Unit (EARU) on November 19, 2001. The termination resulted from an incident which occurred between Plaintiff and Defendant Cross on October 28, 2001 involving completion of a leave slip for Plaintiff's absence from work on October 27, 2001. As a result of the incident Defendant Cross cited Plaintiff for several violations of the ADC employee conduct standards and recommended that Plaintiff appear before an Employee Review Board (the Board) for disciplinary action. On November 6, 2001 the Board held a hearing, reviewing exhibits and taking testimony from Plaintiff. After deliberation

1

the Board recommended termination of the Plaintiff. Warden Evans met with Plaintiff November 19, 2001 to discuss the charges against Plaintiff, ultimately following the termination recommendation of the Board, terminating Plaintiff's employment as of that date.

## II. Discussion

**A**. Legal Standard

In deciding the Motion for Summary Judgment this court will consider the facts in the light most favorable to plaintiff Alexander and will draw all justifiable inferences in his favor. *Putman v. Unity Health Sys.*, 348 F.3d 732, 733 (8th Cir. 2003). In order for the court to grant summary judgment, the movant must show that the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the dispute may be decided solely on legal grounds. *Iowa Coal Min. Co. V. Monroe County*, 257 F.3d 846, 852 (8th Cir.2001); Fed.R.Civ.P. 56(c). Once the moving party has made this showing, the non- moving party must go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). As to materiality ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Rule 56 does not require the Court to accept unreasonable inferences which are not supported by the facts of a case. *Mathes v. Furniture Brands Int'l, Inc.,* 266 F.3d 884, 888 (8th Cir. 2001) (court only required to give plaintiff benefit of all reasonable inferences, not those inferences that require speculation). In fact, to survive a motion for summary judgment, the nonmoving party must "substantiate his allegations with sufficient probative

evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Putman v. Unity Health System,* 348 F. 3d. 732, 733-34 (8th Cir. 2003), citing *Wilson v. Int'l Bus. Machs, Corp.,* 62 F.3d 237, 241 (8th Cir. 1995).

B.  Allegations

In his Amended Complaint (DE# 21), Plaintiff asserts violations of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §1981, and 42 U.S.C. §1983. Plaintiff's Amended Complaint states:

> That on or about September 20, 2001, the Plaintiff, while acting within the scope of his employment, was approached by defendant Lieutenant Donald Cross who proceeded to use racial slurs. At all times relevant to this cause of action, Lieutenant Donald Cross was a "shift supervisor" and superior officer to the plaintiff acting within the scope of his employment. Plaintiff worked subject to his direction and control.
> That Lieutenant Donald Cross had used racial slurs prior to the aforementioned date and subsequent to the incident of September 20, 2001.[1]  The use of such language created a great amount of hostility in the work place because plaintiff is African-American and Lieutenant Donald Cross is Caucasian.  This hostility led to a confrontation between the plaintiff, Dwayne Alexander, and Lieutenant Donald Cross. Plaintiff was terminated as a result of this confrontation.
> That the aforementioned racial slurs created a hostile environment which culminated in the wrongful termination of the plaintiff. That the termination of Plaintiff resulted in a loss of income. That the Plaintiff is a black employee and has been terminated because of his race and his refusal to acquiesce in or submit to racial slurs. That the Plaintiff has filed a Charge of Discrimination and has been granted a "right to sue" by the U.S. Department of Justice.
> In his deposition, Plaintiff testified that on September 20, 2001, he and officer Sanders were

walking up the hallway when Lt. Cross said, "what you niggers up to?" and then said "what's up my nigger?" (DE# 55, Plaintiff's depo. pg.20, lines 19-25). Plaintiff further testified that Cross "always

---

[1] Lt. Cross denies that he uses the offensive "N" term, and denies that he made any comments attributed to him by plaintiff Alexander (DE# 40, exh.C).  However, for the purposes of this motion, the court will proceed as if all alleged comments were verbalized by Cross.

say it...what's up my nigger?" and that Cross says it to both inmates and officers (DE# 55, pg. 21, lines 1-15). Plaintiff testified that he did not hear Cross using the "N" word in many other phrases, but did recall once overhearing Cross tell an inmate "you niggers get somewhere and sit down." Plaintiff testified that when Cross noticed Plaintiff standing close by, Cross smiled and closed the door (DE# 55, pg.23, lines 1-12). Plaintiff testified that Cross did not say anything directly to him, but "he know I don't like it" (Pg.23, lines 8-10). Plaintiff testified that he never told Cross that he did not like the use of the offensive phrase, and "didn't pay him no attention most of the time because I know he don't know what he's doing" (pg.24, lines 11-15). Plaintiff opined that "if he couldn't tell by the expression in my face that I didn't like, that's his problem...I always walked off from him when he goes to using it" (pg. 24, lines 17-19).

On the EEOC filing charge Plaintiff adds an incident which he states occurred on October 22, 2001: "...on the date and time 10-21-01 6:25 pm I went into the security office and Lt. Cross state to what up my nigger. I state to him can I leave at 6:30 pm he said yes went I leave. Then he state my nigger check out my new truck on the parking lot when you leave it black and gray. I have heard him use the nigger word several time it very under profession for a supervisor to use sublanguage." (DE # 39, exh.B-22).

**C**. Dismissals/ Capacity and Qualified Immunity

All Title VII claims against defendants Cross and Evans in their individual capacities are dismissed as they are not "employers" for purposes of Title VII. *See Bates v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998)(supervisors are not individually liable under Title VII).

Also, all Plaintiff's Section 1981 and 1983 claims against the ADC are dismissed because it has Eleventh Amendment Immunity and is not a "person" for claims of this nature. *Will V.*

*Michigan Dept. of State Police*, 491 U.S. 58 (1989).

The court finds that Plaintiff's Section 1981 and 1983 claims against defendant Evans[2] must be dismissed because Evans is entitled to qualified immunity. "Qualified immunity shields government actors from liability in civil lawsuits when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Prater v. Dahm*, 89 F.3d 538, 540-41 (8th Cir. 1996)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

This court has established a three-part test to determine whether a government official is protected by qualified immunity: (1) the plaintiff must assert a violation of a constitutional or statutory right; (2) that right must be clearly established; and (3) taking all facts in a light most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right. *See Yowell v. Combs*, 89 F. F3d 542 (8th Cir. 1996). The issue of whether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law. *Greiner v. City of Champlin*, 27 F.3d 1346 (8th Cir. 1994). But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, or if the moving party is not entitled to judgment as a matter of law, there can be no summary judgment. *Mueller v. Tinkham*, 162 F.3d 999 (8th Cir. 1998).

In construing the facts most favorably for the Plaintiff, Alexander testified[3] that, a little over a month before he was terminated, he reported Cross' racial slurs and told Evans that he had

---

[2] Evans, an African-American, has worked in corrections for over 31 years, including terms as assistant warden, and administrator of probation and parole services for the ADC. (DE# 40, exh. "A").

[3] Alexander deposition (DE# 40, exh. "B" pgs. 13-14, 25-26, 32).

5

retained a lawyer. However, Alexander also testified initially that he only talked to Evans twice during his entire term of employment–once on the phone about his holiday pay and another time on the day he was terminated.

There is no dispute as to Evans' complete lack of involvement in the alleged discriminatory comments. When formally notified of Alexander's complaints (upon filing of the EEOC charge), Evans turned the alleged claims over to Internal Affairs for investigation. As such, Evans is entitled to qualified immunity on Alexander's claims.

**D**.  Section 1981 and 1983 Claims

Plaintiff can prevail under §1983 only if he proves he has been subjected to deprivation of rights, privileges or immunities secured by the Constitution of laws of the United States by one who acts under color of state law. 42 U.S.C. §1983 ; *Montano v. Hedgepeth*, 120 F.3d 844 (8th Cir. 1997). Plaintiff cites 42 U.S.C. § 1981 as another statutory basis for his claims in paragraph 1 of his Amended Complaint, but never mentions it again. This is of no moment however, for the burden of proof of establishing race discrimination is the same under §§ 1981, 1983 and Title VII.. See, *GUI v. Reorganized School Dist. R-6,* 32 F.3d 376, 378 (8th Cir. 1994) and *Jiles v. Ingram,* 944 F.2d 409 413 (8th Cir. 1991). Plaintiff's claims for discrimination and retaliation are analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* approach, the plaintiff must establish a factual presumption of intentional discrimination, requiring evidence (either direct or circumstantial) that: (1) he was a member of a protected group, (2) he was meeting the legitimate expectations of his employer, (3) he suffered an adverse employment action, and (4) there are facts that permit an

inference of discrimination. *Taylor v. Southwestern Bell Tel. Co.,* 251 F.3d 735, 740 (8th Cir.2001). If plaintiff satisfies this burden, the defendant must articulate a legitimate, nondiscriminatory reason for its employment action. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S.133, 141-42 (2000). The burden on the defense is one of production, not persuasion. *Id.* If the defense articulates such a reason, the "presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering [direct or circumstantial] evidence demonstrating that defendant's explanation is pretextual." *Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n. 3 (2003). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

Although this court is doubtful that Plaintiff has put forth sufficient evidence to demonstrate that he was meeting the legitimate expectations of his employer in light of the history of numerous "write ups" for his performance,[4] for the purpose of this analysis the court will assume that Plaintiff was meeting employment expectations. Also, the court will assume that Plaintiff has met the other prongs of the *prima facie* case.

Defendant advances a legitimate, nondiscriminatory reason for plaintiff Alexander's

---

[4] On October 29, 2001, in accordance with East Arkansas Regional Unit Policy 3.10, Employee Review Committee, Alexander was issued a copy of the written warnings from Cross dated July 16, 2001, August 31, 2001, October 27, 2001, and October 28, 2001. Alexander acknowledged receipt of these documents. Alexander was also advised in writing by Captain Barnes that he was charged with several violations of the Employee Conduct Standards and would be required to appear before the Employee Review Committee on November 6, 2001 in accordance with East Arkansas Regional Unity Policy 3.10.0. Alexander signed the notices and acknowledged receipt of all of these documents ( (DE# 40, exh. B, pp. 54-56 and depo. ex. 14-15; Ex. A, ¶ 15-16).

termination. Defendant states that Alexander was found to have violated numerous ADC employee regulations and directives prior to the incident which ultimately led to his termination. Alexander admitted to several of the violations during his appearance before the Employee Review Board (ERB)[5] (DE#40, exh. 17) including the October 28, 2001 incident. Further, Alexander does not dispute defense assertions that he made the insubordinate and profane remarks attributed to him by defendant Cross on the morning of October 28, 2001 (DE# 40, exh. B, pg. 49-52). Alexander testified in his deposition that he cannot remember much about what occurred the morning of October 28, 2001 ( (DE# 40, ex. B, p. 48, lines 4-9), but admits he was given a write up for his behavior. Alexander testified it is possible he stated in a loud tone of voice that Cross was "no fucking lieutenant" (Ex. B, p. 49, lines 24-25 and p. 50, lines 1-5). Alexander also testified that it is possible he said, "I don't give a damn about no fucking write up" (Ex. B, p. 50, lines 6-8). Alexander admits he grabbed a leave slip out of Cross' hands. He admits he was told to bring it back and he laid it on the computer (Ex. B, pp. 50-51). When Alexander was asked in his deposition if he told Cross that he was not writing up the rest of these "fucking officers," Alexander testified, "I said that." Alexander was again asked, "You told him that?" To which Alexander responded, "Yes, I sure did" (Ex. B, p. 51, lines 2-7). Alexander also admitted that when Cross asked for his badge, he might have said, "I ain't giving him shit" (Ex. B, p. 52, lines 10-14). Alexander does not dispute that he was escorted from the workplace after the incident. Prior to his appearance before the ERB, Alexander signed notices acknowledging receipt of prior violations (DE# 40, exh. B). The ERB report indicates that Alexander was

---

[5] The ERB was composed of Capt. T. Barnes, CO-1 C. Taylor and Sgt. Routon. Alexander does not contend that the ERB was biased or that it failed to properly consider the evidence in making its recommendation that Alexander be terminated.

present and testified before the board on November 9, 2001. It is noteworthy that Alexander did not mention his concerns of discrimination or retaliation during his appearance before the ERB. The board's recommendation of termination[6] was forwarded to Warden Evans. Warden Evans met with Alexander in person on November 19, 2001.

**E.**  Hostile Work Environment

Alexander also argues that he was subjected to a hostile work environment. Harassment of an employee based on a prohibited factor (e.g., gender, race, religion) is prohibited conduct under Title VII.. Hostile work environment harassment occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S., 17 (1993).

To establish a *prima facie* case, Alexander must show that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper action. *Sallis v. University of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). The environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim. Factors to be considered include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Sallis* at 476, quoting

---

[6] After the hearing and after reviewing Alexander's personnel file, the board recommended that Alexander's employment be terminated (DE# 40, exh. B, depo. ex. 17; Ex. A., ¶ 20). This was consistent with the ADC's progressive discipline policy as outlined in AR 225.

<u>*Elmahdi v. Marriott Hotel Servs., Inc.,* 339 F.3d 645, 653 (8th Cir.2003).</u>

Plaintiff's complaint alleges Cross stated to the plaintiff, "What you niggers up to?" on September 20, 2001 and "What's up my nigger" on October 22, 2001. The plaintiff also testified in his deposition that he heard Cross use the word "nigger" several times in casual conversation with others and exchanged the phrase "What's up my nigger" in greetings with friends, employees and prisoners (Ex. B, p. 29). In total, Alexander specified four or five instances where the slur was used by Cross (Ex. B, pp. 84-85).

The Eighth Circuit held that "racial slurs alone do not render a work environment hostile as a matter of law." *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003). Alexander must prove that the workplace was "permeated with discriminatory intimidation, ridicule, and insult…."*Id.* "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098, 1101 (8th Cir. 2005).

Assuming the remarks alleged by Alexander were in fact spoken, this court in no way would condone or excuse such offensive and disgusting language. However, from a legal standpoint the remarks alleged were infrequent, never overtly threatening or physically violent to Alexander, and were mere offensive utterances, that admittedly did not interfere with Alexander's work performance. Alexander conceded they did not adversely affect his job performance or his ability to do his work and stated he was never threatened by Cross and was not afraid him (DE# 40, exh. B, pgs. 96-97).

Based upon the record before the court, the undersigned finds that Plaintiff's claims do not rise to the level contemplated to establish a hostile work environment. There is no evidence that Plaintiff's work place was permeated with such egregious conduct.

**F.** Retaliation

To prove his retaliation claim, Alexander has the burden to show (1) he engaged in statutorily protected acts; (2) his employer subsequently took an adverse employment action; and (3) the adverse action was causally linked to his protected activity. See *Cross v. Cleaver*, 142 F.3d 1059, 1071-72 (8th Cir.1998); *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir.1997).

Alexander admits he never formally reported the racial slurs to anyone. Alexander testified that he never told Cross that he did not like his use of the word "nigger"(DE#40, exh. B, p. 24, lines 11-15 and p. 100, lines 4-8). He never reported the racial slurs to Cross'supervisors, Capt. Barnes or Asst. Warden Walls (DE# 40, exh. B, pp. 15, 24-25). Alexander never mentioned anything about racial slurs to Lt. Taylor (DE# 40, exh. B, p. 56). He never reported the use of racial slurs to Internal Affairs (DE# 40, exh. B, p. 31 lines 14-16). In fact, he never reported any racial slur to anyone in his chain of command other than the one time he claims he told Evans (Ex. B, p. 28, lines 15-17). Alexander never wrote anything down and never submitted a grievance regarding this matter, but understood that if he had a problem at the ADC he could file a grievance (Ex. B, pp. 18, 27).

Even assuming that Alexander's verbal comment to Evans prior to the October 28, 2001 incident was a form of protected activity, there is no evidence to indicate that this reporting was

causally linked to his termination. In fact, Warden Evans testified that on November 19, 2001, Evans met with Alexander to discuss his testimony at the Employee Review Board hearing. Evans stated that he discussed the matter with Alexander, and Alexander pled guilty to all of the charges brought by Cross ( DE# 40, exh. B, p. 67, lines 1-5; exh. A, ¶ 22). Alexander testified in his deposition that he pled guilty to all the charges brought by his supervisor when he talked to the Warden (DE# 40, exh. B, p. 67, lines 1-5). According to Evans, Alexander stated he was "burned out" and ready to be terminated (DE# 40, exh. A, ¶22). Alexander testified that Evans said, "Tell me what you can tell me to keep your job." Alexander stated, "I'm already fired. I told him I couldn't tell him nothing" (DE# 40, exh. B, p. 67, lines 8-16). Alexander admitted that he called Cross a punk and that all of the allegations in the letters were true (DE# 40, exh. B, p. 67, lines 17-21; exh. A, ¶ 22). Alexander earlier stated that he told Evans, "anything you want to make true on there, make it true, if it makes him feels good" (DE# 40, exh. B, 53, lines 12-13). Based upon his discussion with Alexander, Evans followed the recommendations of the ERB. He advised Alexander that insubordination could not be tolerated because it threatened the good order and safe operation of the unit and Evans terminated Alexander's employment with the ADC and informed Alexander that he could appeal his termination to the Director. (DE# 40, exh. A, ¶ 23; and exh. B, depo. exh. 20).

Alexander did not appeal this decision to anyone within the ADC (DE# 40, exh. B, p. 66). Other than writing Alexander up for behavior which Alexander does not deny, there is a complete lack of evidence that Cross was in any way involved in Alexander's subsequent termination. There was no mention of Alexander's claims of discrimination or retaliation relating to Cross until after Evans had terminated his employment. As such, Plaintiff's proof falls far

12

short of the mark required to defeat Defendant's motion for summary judgment.

THEREFORE, Defendants' Motion for Summary Judgment (DE# 39) is GRANTED and the case is dismissed with prejudice. All other pending motions are denied as moot.

IT IS SO ORDERED this 28th day of March, 2006.

_____
UNITED STATES MAGISTRATE JUDGE